## Jones et al. v. Kentucky Glycerine Company.

(Decided December 7, 1928.)

### Appeal from Laurel Circuit Court.

1. Appeal and Error.—Finding by chancellor will not be disturbed by Court of Appeals, if evidence creates no more than doubt as to its correctness.

2. Estoppel.—One may estop himself, not only by express words or by active conduct, but likewise by silence when it is his duty to speak; such estoppel being "estoppel by silence."

3. Estoppel.—In action by mortgagee purchasing property at foreclosure sale to recover possession of property against defendants claiming superior liens thereon, evidence, that agent authorized to sell property by corporation originally owning property notified defendants as directors that sale could not be made to person specified, that property was sold to new company to knowledge of defendants, who silently permitted new company to take charge of property and accepted notes in consideration for property, showed that defendants approved appearances of ownership of property by new company mortgaging same to plaintiff extending credit to new company in reliance on such ownership, and hence defendants were estopped to contest mortgage as against mortgagee.

4. Appeal and Error.—Where it was not contended that matter set up in defense of pleadings and attempted to be litigated could not properly be so done because of failure to make company originally owning property party to litigation, but no objection was made thereto, defect, if any, in practice will be treated as waived.

5. Estoppel.—That evidence showed defendants acted as officers of a corporation would not detract from estopping effects of their conduct as individuals or militate against rights of plaintiff against defendants, where defendants appeared in case as individuals and asserted individual rights.

JOHN S. CARROLL and B. J. BETHURUM for appellants.

BENTON & DAVIS for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

In 1919 appellants (Cy Jones et al.) and other persons not parties to this litigation, organized and incorporated the Bernstadt Oil & Gas Company for the purpose of drilling for oil in Laurel county and developing certain oil leases transferred to it by the incorporators, aggregating about 3,500 acres. A drilling rig was purchased and the drilling of a well started on the farm of

Cy Jones, one of the lessors in the leases acquired by the company. After the consumption of much time, and at considerable expense, the well was sunk to a depth of about 2,500 feet with no discovery of oil except faint traces, and which exhausted the company financially. It was then agreed that Thank Jones, one of the stockholders and directors, be employed to continue the drilling at an agreed price, and he sunk the well to an additional depth of perhaps 500 feet with practically the same results as obtained by the company before his employment. At the expiration of that time the company owed him $3,000, and it executed to him its note therefor secured by mortgage on its property, including the drilling outfit. In the meantime appellants had become surety for the company to certain banks on notes aggregating $3,800, and they were indemnified by the company executing to them a second mortgage on its property including the drilling outfit. Thank also executed a note to a bank with appellants, or some of them, as sureties, and as collateral surety therefor he pledged the company's note to him of $3,000.

The banks instituted actions on all of such indebtedness, resulting in judgments against appellants, and, in the action on the Thank Jones note to secure which he had pledged the $3,000 note held by him against the company, that collateral was sold and appellants became the purchasers, which made them the owners of all the mortgage liens that had been executed by the company on its property. In that situation great gloom took possession of appellants and their associates because of the flaunting of their visions of wealth and luxury that they had entertained as a result of the drilling. A ways and means meeting of the directors was called, and divers and sundry propositions were there made suggesting methods for extricating the company from the financial hole into which it had gotten itself and its directors, and to dispossess itself of the dry hole that had produced that lamentable condition. Various possible purchasers of the company's property were suggested, and those doing so were instructed to communicate with them with a view of selling the property. However, the chief reliance by appellants for the restoration of renewed hopes and the eventual realization of their originally entertained anticipations was Thank Jones, whom his associates viewed as a local financial Napoleon, and who, on account

of his industry and business sagacity, they thought could accomplish wonders. At that meeting Thank suggested· that one Dr. Couden, who was engaged in similar developments in and around Hazelpatch, a nearby locality, would possibly buy the company's outfit, including the leases held by it, except an acreage of between 600 and 900 acres to be retained by the company.

The secretary of that meeting, who was also a director and stockholder, afterwards or at that time, made this entry on the books of the company:

> "Motion made and seconded for the Secretary to draw up some kind of writings to give Thank Jones a right to sell oil rig and leases to Dr. Couden. Motion carried. Meeting closed. P. R. Ott, Secretary."

Thank was not given a copy of that entry, and he testified that no such limiting authority was conferred upon him. On the contrary, he testified that at that meeting he was given absolute authority to effect a sale of the property under some kind of arrangement whereby the situation would be relieved and the hovering clouds of despair dispelled. Shortly after that meeting, and on November 8, 1922, the company's secretary and Thank met at the former's home, and "some kind of writing" was executed by the secretary to him (Jones) which on its face conveyed the property of the company to him, including all of its leases, except certain reserved ones, for the express consideration of $10,000, which was the amount of all the indebtedness of the company, including that hereinbefore referred to. Seven thousand five hundred dollars of the consideration was evidenced by a note then and there executed by Jones to the Bernstadt Company, it being recited in the writing that $2,500 was paid at the time, but which was evidently untrue. The title to the property was warranted in that writing, and it contained a covenant that all of it was free of liens and incumbrances. The company's name was signed to it, "By Cy Jones, President," and it was attested by the secretary; but the latter did all of that signing himself under· the belief that the order made by the directors at their meeting so empowered him. It is explained by the secretary and Thank that the purpose of having the writing drawn in that fashion was to enable the latter, if he found· a propitious opportunity, to close up any deal that he

might succeed in negotiating without having to incur the delay incident to reporting to the company and it formally executing the necessary papers therefor.

Thus armed, Thank started out to perform the mission for which he had been selected and to accomplish the task with which he had been so confidently intrusted. He first applied to Couden, which proved to be fruitless, but he did not thereafter cease his efforts, and at the end of a long waiting period (the property of the company in the meantime being idle), he succeeded in organizing another company in Winchester called the Consumers Oil & Development Company. He exhibited his above title papers to that company, and it accepted from him a conveyance of the property to it. Some of its stockholders and directors then went to London and met Cy Jones and others of the appellants, and they transferred all of the leases held by the Bernstadt Company to the new company, excepting those reserved, and following that the latter company began the further development of the well after the lapse of about 2 years during which nothing was done. A number of the appellants accepted employment from it during the time of its further drilling of the well and in which it was engaged for a period of some four or five months, when it reached a depth of nearly 3,500 feet and got to the point where it and all interested parties concluded that it was time for it to be shot.

In the meantime the day of the shooting had been advertised, and it was made a gala occasion. The entire neighborhood collected around the well, and renewed hopes were visible everywhere, which found expressions from some, if not all, of the appellants that "Thank is a wonder." The latter, before the shooting, made a speech to the gathered multitude, in which he extolled the certainties of success and the consequent enrichment of all concerned, including the incidental and collateral interest of the appellants as lessors and as stockholders in the Bernstadt Company which still owned the reserved leases. He announced, according to creditable testimony in the record, that the Consumers' Company had been conveyed the title to all of the property of the Bernstadt Company except the reserved leases, and, because of the great opportunity then and there afforded the stockholders of the Bernstadt Company, he urged them to immediately subscribe for stock in the Consumers' Company,

since it would be too late to do so after the well had been shot and demonstration thereby realized instead of only confident expectancy beforehand. And so, a number of appellants, who had not theretofore done so, then and there subscribed for stock in the Consumers' Company. After such preliminary exercises and felicitations, the well was shot with nitro-glycerine, but no game was bagged, and it still remained a dry hole.

In the meantime the Consumers' Company had expended practically if not all of its funds, and it became indebted by the execution of the two notes to the appellee and plaintiff below, Kentucky Glycerine Company at Winchester, in the sum of $1,470, the price of the nitro-glycerine with which the well was shot, and to secure those notes it executed a mortgage to plaintiff on the drilling outfit. One thousand dollars was paid on that indebtedness, but the remaining amount of $470 was not paid, and plaintiff instituted an action in the Clark circuit court to obtain judgment and foreclose its lien for that amount, resulting in a judgment to that effect and under which it sold the drilling outfit that was still standing in the same place on the farm of Cy Jones. At that sale it became the purchaser and the commissioner who made it duly reported to the Clark circuit court, wherein it was confirmed and plaintiff was adjudged the title to the property sold.

The defendant Cy Jones declined to surrender the possession of the drilling outfit to plaintiff after it so became the owner of it, and it instituted this action of claim and delivery against him to recover the possession thereof. He answered denying plaintiff's title, and in his pleadings as amended he alleged the facts hereinbefore recited with reference to the liens put upon the property by the Bernstadt Company and of which he and his associates had become the owners, also hereinbefore recited, and he made his pleading a cross-petition against plaintiff and such associates, and they afterwards filed their answer and cross-petition in which they set up and adopted the allegations contained in Cy's pleading. All of them prayed that plaintiff's petition be dismissed, and that their liens against the drilling outfit be adjudged as superior to any claim of plaintiff, and that they be enforced. The reply denied all such claims, and then pleaded the substance of the facts hereinbefore recited as an equitable estoppel against defendants,

which was denied in an appropriate pleading filed by them, and, after the taking of extensive proof consisting of nearly 600 pages, the cause was submitted to the court, and it rendered judgment in favor of plaintiff and dismissed the counterclaims and cross-petitions of the defendants, and complaining of that judgment they prosecute this appeal.

It will be perceived that the only question involved is one of fact. The chancellor adjudged it in favor of plaintiff, and, under the well-established rule of this court in such cases, that finding will not be disturbed if the evidence creates no more than a doubt as to its correctness. If Thank Jones is correct in his testimony that at the meeting in November, 1922, when the secretary was directed to issue to him "some kind of a writing," no limitations were put upon it, then it is clear that the estoppel was thoroughly established. However, the secretary wrote on the record of his company a limitation on the authority given to him to contract with Thank for the sale of the property, and it was proven by a preponderance of the number of witnesses that the order on the book was correctly drawn and contained the limitations actually agreed upon by the stockholders of the company at that meeting. But that fact is denied by Thank, and his testimony is strongly corroborated by the subsequent actions and conduct of all parties concerned. One may estop himself, not only by express words or by active conduct, but likewise by silence when it is his duty to speak, which latter is denominated by the courts and in the books as "estoppel by negligence." See 21 C. J. 1060, sec. 8, and page 1113, sec. 116. The text on the latter page says, inter alia:

"This estoppel arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts."

More than a page of cases are cited in note 53 to that text from the various states of the Union, including those from this court of Lockhart v. Hentland Coal, etc., Co., 182 Ky. 673, 207 S. W. 18; Klump v. Liebold, 3 Ky. Law

Rep. 684, 11 Ky. Op. 421, and Hull v. Evans, 2 Ky. Op. 538. Perhaps almost another page of Kentucky cases of substantially the same tenor could have been cited in support of the excerpt, the doctrine of which is of such universal application as to be known by all practitioners.

However, it is not necessary, in order to uphold the judgment, for us to find as a fact that the testimony of Thank Jones as to what occurred at the directors' meeting in November, 1922, was correct. If the authority voted and given to him at that meeting was confined to a sale to Dr. Couden, he promptly reported his inability to make it, and with the knowledge (as we conclusively gather from the entire record) on the part of the directors of the Bernstadt Company he continued to prosecute his efforts to find a purchaser of the property so that the debts of that company could be lifted and drilling operations renewed, following which every one interested expected to reap enormous profits. Such negotiations finally culminated in the formation of the new company, of which fact appellants were apprised, and they then transferred the leases of the old company to the new one, reserving those excluded from the authority conferred on Thank. They not only silently permitted the latter company to take charge of and to operate the machinery in the further development of the unfinished well, but they bartered their services to it while it was so engaged, and later on they accepted from Thank Jones the two notes for $5,000 that had been executed by the Consumers' Company as consideration for the property with a retained lien on it as security for their payment, and in a writing executed to Jones at that time they agreed to surrender his original $7,500 note when the Consumers' Company paid its indebtedness of $10,000.

It will be observed that the Bernstadt Company was never made a party to this litigation, and, if for any reason it should be held that the Consumers' Company did not have title to the drilling rig, then it was, under the facts disclosed by this record, still in the Bernstadt Company, and, if it should be insisted that all the matters atempted to be set up in the various defensive pleadings (except denials) and attempted to be litigated in this action by only lienors, could not properly be so done, the answer is that there was no objection thereto, and the court without such objection determined the questions,

and the defect, if any, in the practice will be treated as waived.

It is insisted, however, that much of the testimony taken and heard upon the trial consisted in acts and conduct on the part of appellants as officers of the Bernstadt Company that did and could not bind it; but, if we should admit the correctness of that insistence, it would not militate against the rights of plaintiff as against them, or detract from the estopping effects of such acts on their part as individuals, and in which capacity alone they appear in this case, and are complaining on this appeal in defense and the assertion of what they term were their individual rights.

We have no hesitancy in concluding from all the evidence, without further reciting it in detail, that appellants by their actions and conduct, and by their silence when they should have spoken, gave their approval to at least the appearance of ownership of the contested property in the Consumers' Oil & Gas Company, and, that being true, the plaintiff, Kentucky Glycerine Company, acting on such appearance and status, extended credit to that company on the faith of which it accepted a lien given by it on that property and appellants are now estopped to contest as against it the truth of the natural effects of their actions, conduct, and silence manifesting such approval by them.

The trial court having so determined, its judgment is affirmed.